IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CYNTHIA STOHR, *et al.,*

    Plaintiffs,

v.          Case No. 17-1018-JWB

PETER SCHARER, *et al.*,

    Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendant David Farris's motion for summary judgment. (Doc. 92.) The motion is fully briefed and is ripe for decision. (Docs. 93, 102, 105.) Also before the court is Plaintiffs' motion in limine (Doc. 75) and Defendant's response. (Docs. 77, 78.) For the reasons stated herein, Defendant's motion for summary judgment (Doc. 92) is GRANTED IN PART and DENIED IN PART. Plaintiffs' motion in limine (Doc. 75) is DENIED.

**I. Background**

Plaintiffs are the heirs of Ernest A. Stohr, who died on March 30, 2015. They assert negligence claims against the remaining defendant, David Farris ("Defendant").[1] Plaintiffs allege that Defendant negligently started a fire, on a property adjoining theirs, and that the fire caused Ernest Stohr to suffer smoke inhalation and complications that ultimately caused his death two weeks later. (Doc. 82 at 7.) Plaintiffs seek actual damages of just over $3 million, including economic damages of about $2.4 million, as well as punitive damages. (*Id.* at 12.)

---

[1] Defendants Peter and Shawnee Scharer, individually and as trustees of the Scharer living trust, were dismissed by stipulation entered January 31, 2019. (Doc. 95.)

In his summary judgment motion, Defendant argues Plaintiffs cannot prevail because they cannot establish the cause and origin of the fire. Alternatively, Defendant seeks summary judgment insofar as Plaintiffs assert a wrongful death claim, arguing Plaintiffs have no expert testimony to show that Ernest Stohr's death was caused by smoke inhalation. (Doc. 93.)

**II. Facts**

The court finds the following facts to be uncontroverted for the purposes of summary judgment. In keeping with summary judgment standards, where there is conflicting evidence or where a fact depends upon the credibility of a witness, the court adopts the version of the facts most favorable to Plaintiffs. The court does so because "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" in ruling on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A. *Origin of the fire*. Peter and Shawnee Scharer, individually and as trustees of the Scharer living trust, owned property at 610 E. 85th St., Hutchinson, Reno County, Kansas. Plaintiff Cynthia Stohr and her husband Ernest A. Stohr owned property just to the north of the Scharer property at 9002 N. Plum St., Hutchinson, Reno County, Kansas.

Defendant worked and lived on the Scharer property. His duties included mowing the pasture, which he did using the Scharers' tractor. The tractor was blue and gray with a cab. Defendant regularly used the tractor to maintain the pasture. Defendant was the only one known to have access to the tractor and its key at the time of the fire. (Doc. 105 at 3.)

Peter Scharer wanted all of the cedar trees out of his pasture. He would typically gather up cedar trees in piles in the pasture and burn them. Defendant had watched Peter Scharer burn the piles on at least one occasion prior to March 16, 2015.

On March 16, 2015, the day of the fire, Peter and Shawnee Scharer were out of the State. Defendant was the only other person living on the Scharer property at that time. There were piles of cedars out in the pasture that day.

Sometime in mid or late morning on March 16, 2015, Mike Ratzloff was outside walking about 300 yards away from the Scharer property. He saw someone in the Scharers' blue and gray tractor pushing brush onto a pile on the Scharer property. Shortly thereafter, he saw a man with a hat standing by the tractor looking at one of the brush piles. Ratzloff could see three or four brush piles. (Doc. 102-9 at 1.) Later in the day, Ratzloff saw smoke coming from the Scharer pasture. He saw the pasture was on fire, with the wind blowing the fire to the north, and the brush piles were burning. There was somebody on the tractor pulling a disc on the south side of the fire in an apparent effort to create a buffer.[2] Ratzloff subsequently heard the sirens of approaching fire trucks.

Defendant drove a white pickup truck. Soon after the fire began, a white pickup truck resembling Defendant's was seen by a neighbor being driven on the Scharer property on the north side of the fire. (Doc. 105 at 5.) A neighbor also saw a white pickup parked in the vicinity of the brush piles after the fire had started. (Doc. 102-4 at 6.) The neighbor went upstairs in his house to get a better view of the fire. Based on what he saw, he thought the fire had started in the area of the brush piles on the Scharer property, in the same area where brush piles had previously been burned on that property. (*Id*. at 5-6.)

In addition to his job on the Scharer property, Defendant had a job working at Reins of Hope, an organization that provided horseback rides to children and adults with disabilities.

---

[2] There is some evidence in the record that this person may have been Troy Wilder, Shawnee Scharer's brother, who was called by Scharer after she was notified of the fire. At Scharer's request, Wilder went to the property to assist Defendant. Wilder allegedly hooked up the disc after Defendant was unable to do so and used it to create a firebreak. (Doc. 102-16 at 14-18.)

3

Defendant testified that on March 16, 2015, he worked at his job at Reins of Hope from 7 a.m. to 3:00 p.m., before returning to the Scharer property. Defendant denies having started the fire. (Doc. 93-7 at 6.) In his deposition, Defendant testified he was in his room at the Scharer property around 4:45 p.m. when he first saw smoke, went outside, and saw the fire. (Doc. 102-5 at 31.)

Initially, Defendant testified in his deposition that when he first saw the fire, he saw no fire trucks, and he proceeded to call Shawnee Scharer, who told him to call 911. After being shown a transcript of a statement he had previously given to investigators, Defendant changed his deposition testimony to say that when he first saw the fire, the fire trucks were already present, so he called his employer Shawnee Scharer instead of calling 911. (Doc. 105 at 9.) Defendant denied having driven his pickup truck around the fire. (Doc. 93-7 at 6.) He testified that after he saw the fire he went to the tractor and hooked up the "drag" behind it and pulled it through parts of the pasture to try to create a firebreak. (*Id.*)

The fire was reported to Reno County Emergency Services at about 4:35 p.m. on March 16, 2015.

Detective Richard Jennings of the Reno County Kansas Sheriff's Office investigated the fire but "inactivated" the investigation because he was "unable to determine exactly when or where the fire started." (Doc. 93-6.)

B. *Circumstances of Ernest Stohr's death.* After learning of the fire, Ernest Stohr's son and daughter-in-law assisted him in going to an area of town where there was no smoke. After the fire department cleared the area, Cynthia Stohr returned with Ernest to their home. Smoke was still very thick around the home when they returned. They stayed the night in the home because they could not find any vacant handicap-accessible hotel rooms in the area. During the night, a

4

fire restarted on their property and they worked to put it out, with Ernest using a hose in an attempt to keep the fire from getting to the house. They were outside most of the night.

During the week of March 16 to March 23, 2015, Ernest was using rescue inhalers. He lost about ten pounds that week and was coughing, wheezing, nauseated, and suffering shortness of breath and fatigue. These symptoms started 24 to 48 hours after the fire and progressed throughout the week.

Ernest Stohr was admitted to the hospital on March 23, 2015, complaining of shortness of breath. At the time, he was suffering from chronically high blood pressure, peripheral vascular disease, diabetes, chronic obstructive pulmonary disease (COPD), and avascular necrosis.

On March 30, 2015, Ernest Stohr died. An autopsy was performed. An amended death certificate was filed with the State of Kansas and signed by Jaime Oeberst, M.D. (Doc. 93-9.[3]) Section 28 of the certificate addresses the "Cause of Death." Part I deals with "Events (diseases, injuries, or complications) that directly caused the death." On Line A the physician is to list the "immediate cause," defined as "Final Disease or Condition Resulting in Death." On Line A, Dr. Oeberst listed "Ruptured Abdominal Aortic Aneurysm." On Lines B, C, and D, the physician is directed to list "Conditions, if any, leading to cause listed on line a," and "underlying cause," defined as "disease or injury that initiated the events resulting in death." On Line B, Dr. Oeberst listed "hypertensive and atherosclerotic cardiovascular disease." Part II of Section 28 calls for "other significant conditions contributing to death but not resulting in the underlying cause given in Part I." Dr. Oeberst listed "smoke inhalation, exacerbation of chronic obstructive pulmonary disease, [and] diabetes mellitus." (*Id.*)

---

[3] The parties stipulated to the admissibility of the death certificate, subject to any objections regarding relevance or materiality. (Doc. 82 at 3.)

Plaintiffs cite deposition testimony of Geri Hart, M.D., and argue it shows Hart's opinion that "smoke inhalation from the Fire contributed to Ernest Stohr's death." (Doc. 102 at 13.) The cited portions of the deposition, however, do not show such an opinion. Dr. Hart opined only that the fire exacerbated Ernest Stohr's COPD, which "then caused this cascade of events *that ended in his death.*" (Doc. 102-6 at 4) (emphasis added.) When asked if it was her opinion that the exacerbation of the COPD caused the aneurysm, she said no, and further stated that the aneurysm was caused "by long-standing diabetes, tobacco, [and] hypertension." (*Id.* at 4-5.) She agreed with the statement in the death certificate that the aneurysm was the cause of death. (*Id.* at 5.)

Plaintiffs also cite the deposition of Costy Mattar, M.D., and similarly assert he testified that "smoke inhalation from the Fire contributed to Ernest Stohr's death." (Doc. 102 at 13.) Again, the deposition excerpts do not support that assertion. Dr. Mattar was asked at his deposition to read a letter in which he had previously stated that "[o]bviously the COPD exacerbation and smoke inhalation played a major role in [Ernest Stohr's] death." The letter additionally stated that Ernest Stohr had high blood pressure and "[i]t is possible that the ruptured aortic aneurysm occurred during one of these hypertensive episodes." (Doc. 102-8 at 4.) But in the deposition excerpts cited, Dr. Mattar did not assert that smoke inhalation from the fire played any contributory role in the rupture of the aneurysm or in Mr. Stohr's death. Dr. Mattar only opined that increased blood pressure increased the likelihood of an aneurysm rupturing. (*Id.* at 5.) When asked to explain his opinion concerning the aneurysm, he stated the following:

> Q. Can you explain to us physiologically how an increased blood pressure could lead to a rupture of an abdominal aortic aneurysm?
>
> A. When the blood pressure is high, it put[s] pressure on that pouch and it can rupture. Also, [an] aneurysm can rupture with normal blood pressure.
>
> Q. And so what you're saying is that Mr. Stohr's abdominal aortic aneurysm could have ruptured for a variety of different reasons; correct?

6

> A. Yes.
>
> Q. And you're not able to state to a reasonable degree of medical certainty what likely caused his abdominal aortic aneurysm to rupture; correct?
>
> A. If you want me to tell you the more – more 50 percent [sic] – the likelihood that it rupture[d] from that high blood pressure more than [a] certain number, I can't give you that number.
>
> Q. And I guess what I want to know is, in this case, are you attempting – you used the word possible –
>
> A. Possible, yeah.
>
> Q. In your letter.
>
> A. Yeah.
>
> Q. And I understand when you say possible, what you've told us is there's several possible reasons why his –
>
> A. Yes.
>
> Q. - abdominal aortic aneurysm, which killed him, could have ruptured; correct?
>
> A. Yes, yes.
>
> Q. All right. And so what I want to know is, in this case, are you intending to offer an opinion that you know what the – what likely caused his abdominal aortic aneurysm to rupture?
>
> A. To rupture? I cannot tell you what likely. [sic] Possibly the high blood pressure. Possibly the stress of the shortness of breath. Possibly that was the time for the aneurysm to rupture because it can do it. Like you can wreck your car driving going on the highway; the same thing. Because it can happen. And that's how people die, regular people, regardless if they were in the hospital or walking on the street.

(*Id.* at 2.) The court finds that Plaintiffs' proposed fact that smoke inhalation contributed to the death of Ernest Stohr is not supported by the deposition testimony.

Finally, Plaintiffs cite a letter dated September 1, 2016, from Steven Ronsick, M.D., which stated in part that "[t]he smoke inhalation and the exacerbation of his COPD and acute respiratory failure are definitely linked to the grass fire smoke inhalation which caused [Ernest Stohr's] death." (Doc. 102-13.) Aside from the confusing nature of this assertion, Dr. Ronsick's letter is clearly

7

unsworn hearsay and is not admissible in evidence to prove the cause or causes of Ernest Stohr's death. *See Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment); *Capobianco v. City of New York,* 422 F.3d 47, 55 (2d Cir. 2005) ("As a general matter, it is correct that unsworn letters from physicians generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment.")

### III. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Id*. The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### IV. Analysis

1. *Cause of the fire*. Plaintiffs' negligence claim[4] requires them to prove by a preponderance of evidence that Defendant's negligent acts caused them damages.[5] The burden of proving causation was discussed in *Yount v. Deibert,* 282 Kan. 619, 147 P.3d 1065 (2006), a case in which there was no direct proof of the cause of a fire but circumstantial evidence pointed to a group of boys who had been playing with fire before the incident. In addressing the burden of proof, the court quoted at length from a well-known treatise:

> The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant. Where the conclusion is not one within common knowledge, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn....
>
> The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not [negate] entirely the possibility that the defendant's conduct was not a cause, and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no one can say with absolute certainty what would have occurred if the defendant had acted otherwise. Proof of what we call the relation of cause and effect, that of necessary antecedent and inevitable consequence, can be nothing more than 'the projection of our habit of expecting certain consequents to follow certain antecedents merely because we had observed these sequences on previous occasions.' If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exists.

---

[4] Plaintiffs asserted a theory of negligence per se in the pretrial order in addition to ordinary negligence. (Doc. 82 at 6-7, 9.) Defendant has moved for summary judgment on the negligence per se theory, arguing the pretrial order shows that Plaintiffs only asserted that theory against the Scharers. (Doc. 93 at 16.) *See* Fed. R. Civ. P. 16(d) (the pretrial order controls the action unless the court modifies it.) Plaintiffs' response does not address the issue. (Doc. 102.) Because Plaintiffs have not contested the issue, the court will grant Defendant's motion for summary judgment insofar as Plaintiffs now seek to assert a theory of negligence per se against Defendant.

[5] Plaintiffs seek various other damages in addition to damages for wrongful death. (Doc. 82 at 12.)

*Id.* at 628–29, 147 P.3d at 1072–73 (quoting Prosser & Keeton on Torts, § 41, pp. 269-70 (5th ed. 1984)).

Plaintiffs argue the evidence shows a genuine issue of fact as to what time Defendant was present on the Scharer property on March 16, 2015, and whether he lit any brush fires that day. The court agrees. A jury viewing the evidence in Plaintiffs' favor could reasonably conclude that Defendant was, more likely than not, the person seen on the morning of March 16, 2015, piling up brush on the Scharer property with the Scharers' tractor. A jury could further conclude Defendant likely started the fire by burning those brush piles. There is no direct evidence of this, but a jury examining all of the circumstances could, if it drew all reasonable inferences in Plaintiffs' favor, make such findings by a preponderance of the evidence. The circumstances potentially supporting such a conclusion include evidence of the following: that Defendant had previously watched Peter Scharer burn the brush piles; that Defendant knew Peter Scharer wanted the cedars burned and the fact the brush was piled up for burning on the day of the fire; the fact that Peter and Shawnee Scharer were out of town at the time of the fire; Defendant's exclusive access to the tractor on the morning and afternoon of the fire; Mike Ratzloff's testimony that he saw a man using the Scharers' tractor to pile up brush shortly before the fire; testimony indicating the fire likely started in the area of the brush piles; the sighting of what appeared to be Defendant's pickup truck parked by the brush piles and driving around the fire; the absence of evidence suggesting a likely alternative source or cause of the fire; and the absence of an indisputable alibi for Defendant for the morning of March 16, 2015, or for the afternoon when the fire apparently started.[6]

---

[6] Defendant cites no uncontroverted evidence establishing an alibi. The court notes it is uncontroverted that a document created by Defendant allegedly showing his work times at Reins of Hope in March of 2015, differs markedly from other, more detailed time records from Reins of Hope. (Doc. 105 at 6-7.) Also, the document shows no specific hours worked for any day of March 2015 and indicates Defendant was paid for only two hours of work each day that month. (*Id.*)

As in *Yount,* there is no direct or concrete proof here of how this fire started, and the authorities ultimately reached no conclusion as to its cause, but enough circumstantial evidence has been cited to allow a reasonable jury to conclude that Defendant's negligent actions more likely than not caused the fire. A jury could reach that conclusion by drawing inferences from the evidence such that it would constitute a reasonable deduction rather than mere speculation. Accordingly, Defendant's motion for summary judgment will be denied insofar as he claims Plaintiffs have failed to cite evidence showing a genuine issue of fact as to the cause of the fire.

2. *Wrongful death*. "If the death of a person is caused by the wrongful act or omission of another, an action may be maintained for the damages resulting therefrom…." K.S.A. § 60-1901(a). As explained in *Burnette v. Eubanks*, 308 Kan. 838, 425 P.3d 343 (2018), this requires a showing that a wrongful act "caused or contributed" to the death. But regardless of whether an act is claimed to be the sole cause or a contributing cause, a plaintiff must show "but-for causation" – meaning if the death would have occurred without a defendant's negligence, no causation has been shown and there is no claim for wrongful death. *Id.* at 842-43, 425 P.3d at 348.

Plaintiffs argue the testimony of Drs. Hart and Mattar satisfies the causation element, because it shows there was a "direct causal relationship between Ernest's smoke inhalation, the spiking of his blood pressure for many hours, and the fatal rupture of his aortic aneurysm." (Doc. 102 at 20.) But as previously indicated in the statement of facts, the deposition testimony of these witnesses does not include any opinion that smoke inhalation from the fire was a contributing factor in the rupture of the aneurysm or in Ernest Stohr's death. Nor can the letter of Dr. Ronsick satisfy the causation element, because the letter is inadmissible hearsay. Finally, to the extent Plaintiffs rely on the death certificate alone to establish causation, the document itself is equivocal and is insufficient for a jury to conclude – without resorting to speculation - that smoke inhalation

11

was a "but-for" cause of the rupture of the aneurysm. Expert medical testimony is required under these circumstances to establish that smoke inhalation from the fire was a cause of Mr. Stohr's death. *See Puckett v. Mr. Carmel Reg. Med. Center,* 290 Kan. 406, 435-36, 228 P.3d 1048, 1068 (2010) (expert testimony is generally required to establish causation on medical issues because such matters are outside the knowledge of the average lay person.) Because Plaintiffs have failed to cite expert medical testimony from which a jury could properly find that smoke inhalation caused or contributed to Mr. Stohr's death, the claim for wrongful death fails as a matter of law. Defendant's motion for summary judgment is accordingly granted insofar as Plaintiffs assert a claim for wrongful death. This ruling does not preclude Plaintiffs' negligence claim insofar as it seeks damages other than those for wrongful death. *See* K.S.A. § 60-1801 (an action for injury to a person or to real estate survives the death of the injured person, and may be brought notwithstanding the death of the person.)

**V. Motion in Limine**

Plaintiffs seek an order in limine precluding Defendants from introducing any evidence of "collateral source" benefits that Plaintiffs received from third parties, and evidence of "unrelated acts of arson that were committed in Reno County by a third party." (Doc. 75 at 1.)

1. *Collateral source benefits*. Under the collateral source rule, benefits received by a plaintiff from sources independent of and collateral to a wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer. *Rose v. Via Christ Health System, Inc.*, 276 Kan. 539, 544, 78 P.3d 798, 802 (2003). Plaintiffs seek an order excluding from trial any evidence that Plaintiffs received any benefits or compensation "by reason of the illness of, injuries to, or death of Ernest Stohr." (Doc. 75 at 1.) Defendant's response[7] argues that evidence of the following

---

[7] Defendant filed a notice that he joined in a response brief filed by the Scharers. (Doc. 78).

12

would not violate the collateral source rule and should be admitted: (1) evidence regarding an accidental life insurance policy on which Plaintiffs obtained payment; (2) evidence regarding Cindy Stohr's receipt of a Veterans Administration survivor benefit; (3) evidence of Social Security Disability and Medicaid benefits received by Jeffrey Stohr; and (4) evidence of write-offs and adjustments of Ernest Stohr's medical expenses. (Doc. 77 at 7.)

At least some, and likely most, of the collateral source benefits cited by Defendant may no longer be relevant in view of the court's dismissal of Plaintiff's wrongful death claim. Because the court's ruling has significantly narrowed the damages that remain at issue, and it is unclear from the current motion what collateral source payments (if any) remain at issue, the court will deny Plaintiffs' motion to exclude these items, but will do so without prejudice. The parties are directed to confer as to whether Defendant intends to introduce evidence of any collateral source benefits in view of the summary judgment ruling. Plaintiffs may then refile a motion in limine as necessary to address any remaining items, and Defendant may file a response thereto.

2. *Evidence of arsonist.* Defendant may seek to introduce evidence at trial that an individual named James Farra started ten grass and brush fires in the Hutchinson area on March 14, 2015, four fires on March 24, 2015, and seven fires on April 7, 2015, and that Farra was arrested on seven counts of arson. Defendant alleges that Detective Jennings had Farra in custody in April of 2015, and that Farra admitted having ignited several fires, but Jennings did not ask Farra about the March 16, 2015, fire. (Doc. 77 at 12.) Defendant argues this is circumstantial evidence of possible alternative causes of the March 16 fire and is also relevant to show that Jennings, who reached no conclusion as to the cause of the March 16 fire, failed to thoroughly investigate Farra as a suspect in that fire. For their part, Plaintiffs contend this evidence amounts

13

to speculation that will distract or prejudice the jury, and also that it is inadmissible character evidence. (Doc. 75 at 6.)

The motion to exclude this evidence will be denied. Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence," provided the fact is of consequence to the action. Fed. R. Evid. 401. Evidence that this individual was actively setting fires of a type arguably similar to the one at issue, in the same general area, and at about the same time as the March 16 fire, would tend to make it more probable that Farra started the March 16 fire. It bears noting that Plaintiffs seek to hold Defendant liable for the fire based solely on circumstantial evidence, despite the fact that no one saw him start the fire. By the same token, Defendant is entitled to offer circumstantial evidence of his own suggesting possible alternative causes of the fire, including evidence that another individual in the same area was intentionally setting similar fires. The jury is entitled to consider and weigh this evidence in determining the facts. Plaintiffs have failed to show that the probative value of such evidence is substantially outweighed by the danger of unfair prejudice or confusion of the issues. *See* Fed. R. Evid. 403. Plaintiffs can of course present evidence indicating that Farra was not involved in the March 16 fire, and the jury can make its determination from the totality of the evidence. Finally, the court rejects Plaintiffs' contention that evidence relating to Farra must be excluded as improper character evidence. Rule 404(b) permits evidence of a person's wrongs or other acts to show motive, opportunity, plan, and identity, among other purposes. Fed. R. Evid. 404(b)(2). Evidence that Farr engaged in a series of arsons at the time in question would have a tendency to show such purposes, including the identity of the person who started the fire, separate and apart from any relationship to Farr's character. Plaintiffs' motion to exclude such evidence will be denied.

**VI. Conclusion**

Defendant's motion for summary judgment (Doc. 92) is GRANTED IN PART and DENIED IN PART. Plaintiffs' motion in limine (Doc. 75) is DENIED. IT IS SO ORDERED this 23rd day of May, 2019.

                                                 _____s/ John W. Broomes_____
                                                 JOHN W. BROOMES
                                                 UNITED STATES DISTRICT JUDGE